# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>     Plaintiff,<br><br>v.<br><br>Terry A. Curtin,<br><br>     Defendant. | Case No. 15-cr-0163 (MJD/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Manda M. Sertich, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for United States of America

Piper L. Kenney, Piper L. Kenney PLLC, 510 North First Avenue, Suite 610, Minneapolis, MN 55403, for Terry A. Curtin

HILDY BOWBEER, United States Magistrate Judge

   This case came before the undersigned United States Magistrate Judge for a pretrial motions hearing on August 25, 2015.  The case was referred for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.  The Court will address Defendant Terry A. Curtin's Motion to Suppress Statements [Doc. No. 27] in this Report and Recommendation.  The parties' nondispositive motions were addressed in a separate Order [Doc. No. 34].  For the reasons set forth below, the Court recommends that the motion be granted in part and denied in part, as set forth fully herein.

## I.       Procedural Background

On May 20, 2015, Defendant Terry A. Curtin was charged by Indictment with one

count of False Statement or Fraud to Obtain Federal Employees' Compensation, in

violation of 18 U.S.C. § 1920.  (Indictment ¶ 7 [Doc. No. 1].)  The Federal Employees'

Compensation Act (FECA) provides for compensation to be paid to disabled federal

employees who are injured while working.  (*Id.* ¶ 1.a.)  The United States Department of

Labor (DOL) Office of Workers' Compensation Programs (OWCP) administers FECA.

(*Id.*)  Curtin began receiving FECA benefits on June 23, 2011, as a result of a foot injury

suffered on the job.  (*Id.* ¶¶ 2-3.)  Between May 13, 2014, and June 15, 2014, an

investigator allegedly saw Curtin performing physical activities that were inconsistent

with her claimed disability and consistent with work she could have performed with her

former employer, the United States Postal Service (USPS).  (*Id.* ¶ 5.)  On an OWCP form

submitted on May 22, 2014, however, Curtin reported no improvement in her medical

condition.  (*Id.* ¶¶ 1.c, 4.)

Curtin timely filed her pretrial motions, including a motion to suppress statements,

on August 4, 2015, and the Government opposed the motion to suppress.  The Court held

a pretrial motions hearing on August 25, 2015.  American Sign Language (ASL)

Interpreter Beth Aaron interpreted the proceeding for Curtin, who is deaf.  The

Government submitted four exhibits into evidence: a letter to Curtin dated August 13,

2014 (Gov't Ex. 1); a letter to Curtin dated September 2, 2014 (Gov't Ex. 2); two DVDs,

one marked "1-9" and one marked "10-18," containing video and audio recordings of an

interview conducted on September 25, 2014 (Gov't Ex. 3); and a Current Capability

Evaluation form signed by Curtin and dated September 25, 2014 (Gov't Ex. 4).  Special

Agent Rebecca Wayerski of the USPS Office of Inspector General (OIG) testified for the

Government.

Prior to the evidentiary portion of the hearing, Curtin's attorney narrowed the

scope of the original motion to suppress to Curtin's September 25 statement.  (Hr'g Tr.

8:24-25, 9:1, Aug. 25, 2015 [Doc. No. 36].)  At the conclusion of the hearing, the parties

asked for permission to file post-hearing memoranda, and the Court granted leave for

them to do so.  Curtin timely filed her memorandum on September 18, 2015 [Doc. No.

37], and the Government timely filed its memorandum (after requesting and receiving a

short extension of time) on October 6, 2015 [Doc. No. 40].

In Curtin's memorandum, she asks the Court to suppress her September 25

statements to Special Agent Sara Harlan-Upp, a criminal investigator with the USPS

OIG.  The Court presumes her motion includes her signature on the Current Capability

Evaluation form she signed at the conclusion of that interview, and the statements

recorded on that form insofar as they could be deemed adopted or ratified by Curtin as a

result of her signature.  Curtin argues that the USPS was conducting a criminal

investigation under the guise of a civil workers' compensation matter, in violation of

*United States v. Grunewald*, 987 F.2d 531 (8th Cir. 1993).  Curtin also contends that her

statements were not voluntary, and that her Fifth Amendment right against self-

incrimination and right of due process were violated.  The Government responds that the

Fifth Amendment is not implicated during interactions with undercover criminal

investigators, that falsehoods are not protected by the Fifth Amendment, that Curtin's

3

statements were voluntary, and that *Grunewald* is inapposite.

## II.    Relevant Facts

Curtin formerly worked as an expediter for the USPS.  (Tr. 11:15-20.)  In June 2011, she began receiving FECA benefits due to an on-the-job injury to her left big toe. (Tr. 11:21-25, 12:1-9.)

Special Agent Rebecca Wayerski is a criminal investigator with the USPS OIG. (Tr. 10:22-25.)  In that role, she investigates health care fraud committed by USPS employees, and she is the primary case agent for the investigation of Curtin.  (Tr. 11:4-6, 9-10.)  USPS Health and Resource Management Specialist Nancy Schmitz referred Curtin to Agent Wayerski in March 2014 for a criminal investigation of suspected fraud. (Tr. 32:18-20, 33:25, 34:1-3, 34:18-25.)

As part of the investigation, Agent Wayerski conducted undercover surveillance of Curtin at her home from mid-May to mid-June of 2014.  (Tr. 12:10-21.)  Agent Wayerski observed Curtin maintaining a fairly active lifestyle, walking for several hours a day around her yard, ascending and descending more than 800 stairs in one day, running short distances, and carrying heavy items up and down stairs.  (Tr. 12:24-25, 13:1-4.) Surveillance cameras also captured Curtin raking for more than an hour, picking up sticks, and carrying heavy branches across the yard.  (Tr. 13:5-11.)  Agent Wayerski corresponded regularly with individuals at USPS, including Schmitz, about Curtin and her workers' compensation case.  (Tr. 38:5-12.)

On August 13, 2014, Agent Wayerski prepared a letter notifying Curtin that the USPS was attempting to reduce workers' compensation costs by improving case

management techniques and identifying claimants who could work in a limited duty position or be referred to an outside vocational rehabilitation program. (Tr. 13:21-22, 14:1-7; Gov't Ex. 1.) The letter asked Curtin to attend an interview with a "Postal Service contractor" on September 10, 2014, at a hotel conference room, and instructed her to contact "Contract Vocational Rehabilitation Specialist, Sandra Black" if she had any questions. (Gov't Ex. 1.) The letter warned Curtin that "failure to cooperate with this process will be reported to the Office of Workers' Compensation Programs and could affect your Workers' Compensation benefits." (*Id.*) The letter was not signed by Agent Wayerski, but by USPS District Manager Anthony Williams, who was aware of the ruse. (Tr. 14:8-12, 37:2-7; Gov't Ex. 1.) The real purpose of the meeting was not the reason given in the letter, but to obtain statements from Curtin about her physical abilities that would be inconsistent with the activities captured on the surveillance video and observed by Agent Wayerski. (Tr. 15:6-17, 41:18-23.) Curtin rescheduled the September 10 meeting to September 25, 2015. (Tr. 16:16-21, 17:2-3.)

A few days before the rescheduled interview, Curtin's FECA benefits were terminated. (Tr. 26:16-18, 38:13-17.) Unrelated to the criminal investigation, the DOL had offered Curtin a limited duty job, which she refused, and her benefits were ceased on that basis. (Tr. 26:20-23; 44:5-12.)

On September 25, Curtin drove herself to the interview, which was conducted in a conference room at a hotel and conference center. (Tr. 17:7-8, 11-13.) The room was a long rectangular room with windows, furnished with a table and chairs. (Tr. 17:23-25, 18:1-4.) Special Agent Sara Harlan-Upp, a criminal investigator with the USPS OIG,

conducted the interview.  (Tr. 18:23-24.)  An ASL interpreter was also present.  (Tr. 23-25.)  The interpreter was hired from an outside agency and was not informed about the nature of the undercover interview.  (Tr. 19:13-24.)

After Curtin entered the hotel, Agent Harlan-Upp and the interpreter met Curtin in the hallway and escorted her to the conference room.  (Tr. 21:15-20.)  Agent Harlan-Upp did not identify herself or her role as a criminal investigator, but introduced herself as vocational rehabilitation specialist Sandra Black.  (Tr. 37:10-18.)  She did not inform Curtin that she was the subject of an ongoing criminal investigation, nor did she advise Curtin of any *Garrity* or *Miranda* rights.  (Tr. 22:9-16, 25, 23:1-5, 40:20-25, 41:1-3.)  Agent Harlan-Upp was not wearing a uniform.  (Tr. 23:11-12.)

The entire interview was audio and video recorded, and the Court has viewed the recordings in Government Exhibit 3.  The portions of the recordings relevant to Curtin's motion are summarized below.

In the conference room, Agent Harlan-Upp explained to Curtin they would be completing a questionnaire together, and she asked Curtin to read the blank Current Capability Evaluation form.  Curtin said she was not a good reader and asked Agent Harlan-Upp to read the form out loud so that it could be interpreted for her.  Agent Harlan-Upp did not read through the form at that time, however.

Curtin then asked about the reason for the interview, noting that her FECA benefits had been terminated a few days before.  Agent Harlan-Upp said the assessment was still required, and there was a possibility that Curtin could be assigned a light-duty job.  Curtin said she was confused, because she had been told no light-duty jobs were

available.  Curtin also said she had decided to hire a lawyer to assist her with workers'

compensation issues, and that she had left a message with the lawyer about the interview

but had not heard back.  Agent Harlan-Upp assured Curtin that the assessment would be

straightforward and that the purpose of the meeting was to determine Curtin's abilities,

according to the questionnaire, and suitability for working in a light-duty job.  The agent

said she understood Curtin's frustration and was well-acquainted with such reactions as

part of her job.  Curtin expressed confusion with the various documents she had received

from the USPS, OWCP, and DOL, and became tearful.  Agent Harlan-Upp reassured her

that the purpose of the interview was to ascertain Curtin's abilities so that she could

communicate to USPS the jobs for which Curtin would be suited.

Agent Harlan-Upp's questioning during the interview generally tracked the

questions on the Current Capability Evaluation form, and she wrote on the questionnaire

as Curtin responded to her questions.  Several of Curtin's responses were inconsistent

with the activities Agent Wayerski testified at the hearing she had observed.  Curtin

mentioned in passing one other time that she had spoken with an attorney, but she never

indicated she wanted an attorney present.  Curtin did not ask to end the interview.  Her

demeanor was friendly and polite overall, but she became tearful at times when

discussing the termination of her benefits and the extent of her disability.  Agent Harlan-

Upp made no threats or promises.  Curtin took a break during the interview to answer a

phone call from her doctor, and she freely helped herself to a pitcher of water on the

table.  During a break requested by the interpreter, Agent Harlan-Upp and Curtin showed

family photographs to each other on their phones.

Near the end of the interview, Agent Harlan-Upp said she would review the questionnaire with Curtin and then would ask her to sign it.  Curtin immediately responded that she would not sign the form and wanted to review it with someone else first.  Curtin did not specify whether that person was an attorney, union representative, friend, family member, or other person.  Curtin also said she had been advised not to sign the form, but she did not identify who gave her that advice.  Agent Harlan-Upp responded that Curtin's signature meant the statements recorded on the form were correct and in her own words.

After Curtin and Agent Harlan-Upp reviewed the responses Harlan-Upp had filled in on the questionnaire over the course of the interview, Curtin asked for a copy of the form and the agent's forthcoming report.  Agent Harlan-Upp again asked Curtin to sign the form.  Agent Harlan-Upp then audibly read the certification section, but omitted the phrase "from which a fine and/or imprisonment may result" after the phrase "criminal prosecution."[1]  Agent Harlan-Upp explained that the certification language was the same as on other DOL forms, but she encouraged Curtin to read it for herself.  Curtin nodded

---

[1]  The certification section stated in full:

> I understand that anyone who fraudulently conceals or fails to report information that would have an effect on any benefits, or who makes a false statement or misrepresentation of a material fact in claiming a payment or benefit under the Federal Employees' Compensation Act may be subject to criminal prosecution, from which a fine and / or imprisonment may result.

> I certify that the information provided above is true and accurate to the best of my knowledge and belief.

(Gov't Ex. 4 at 4.)

her understanding.  Agent Harlan-Upp repeated that Curtin's signature meant she agreed the information on the form was true and accurate.  Curtin emphasized she was being honest and signed the form.

The interview lasted approximately two and a half hours, and Curtin was not arrested at the end of the interview.

## III.   Discussion

### A.      Fifth Amendment

Curtin argues that her statements were obtained in violation of her Fifth Amendment right against compelled self-incrimination and the Due Process Clause, and were not voluntary.  Curtin does not contend her statements were the product of custodial interrogation or that a *Miranda* warning should have been administered.

### 1.      Voluntariness

The Fifth Amendment provides that "[n]o person shall be . . . compelled in a criminal case to be a witness against himself."  U.S. Const. amend. V.  To establish a Fifth Amendment violation, Curtin must show that she was "*compelled* to make a *testimonial* communication that is incriminating."  *Barrett v. Acevedo*, 169 F.3d 1155, 1167 (8th Cir. 1999) (emphases in original).  An individual is protected not only "against being involuntarily called as a witness against himself in a criminal prosecution," but also against "official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).

The Fifth Amendment "does not automatically preclude self-incrimination,

whether spontaneous or in response to questions put by government officials," *United States v. Washington*, 431 U.S. 181, 186 (1977), and "does not preclude a witness from testifying voluntarily in matters which may incriminate him," *United States v. Monia*, 317 U.S. 424, 427 (1943).  The element of compulsion or coercion is what drives the right.  *See Washington*, 431 U.S. at 187 ("Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable."); *Monia*, 317 U.S. at 427 ("The amendment speaks of compulsion.").  The test for determining whether an individual was compelled to give self-incriminating testimony "is whether, considering the totality of the circumstances, the free will of the witness was overborne."  *Washington*, 431 U.S. at 188.

The Fifth Amendment also provides that no individual will "be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Both the Due Process Clause and the right against self-incrimination provide a basis "for the requirement that a confession be voluntary to be admitted into evidence."  *Dickerson v. United States*, 530 U.S. 428, 433 (2000).

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."  *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001).  Courts judge the voluntariness of a statement by examining the totality of the circumstances, *id.*, considering factors such as "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition," *Sheets v. Butera*, 389 F.3d 772, 779 (8th Cir.

2004).  In determining whether due process was offended, the Court asks whether "the confession [was] the product of an essentially free and unconstrained choice by its maker?" *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  "A statement is not constitutionally involuntary unless 'the police extorted it from the accused by means of coercive activity.'" *Jenner v. Smith*, 982 F.2d 329, 333 (8th Cir. 1993) (quoting *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir.), *cert. denied*, 482 U.S. 909 (1987)).

The Court will consider separately the statements Curtin made through sign language to Agent Harlan-Upp during the course of the interview, and Curtin's statements recorded on the form by Agent Harlan-Upp and signature certifying that information.

### a.      Statements Provided Through Sign Language

The Court finds here that Curtin's statements provided via sign language to Agent Harlan-Upp were voluntary.  Although the August 13 and September 2 letters informed Curtin that failure to attend the meeting *could* affect her workers' compensation benefits, the letters did not threaten actual termination, and in fact her benefits had already been terminated (because she had chosen not to accept an alternative work assignment) before the September 25 meeting.  In addition, while the letters were misleading as to the nature of the interview, there is no basis to conclude that the description of the potential consequences if she failed to attend was inaccurate.  At the same time, there is no evidence Curtin believed she had no choice but to attend, or would have chosen not to attend, had she known the interview was being conducted as part of a criminal

11

investigation.  Finally, the letters did not affirmatively represent that the interview was *not* a part of a criminal investigation.  The Court finds that, while Curtin was asked to attend the interview under false pretenses, this one factor is not dispositive of the voluntariness analysis.  *See United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010) (recognizing general rule that statements are involuntary because of deception "only when other aggravating circumstances were also present").  That is, the contents of the letters alone did not compel or coerce Curtin to make an incriminating testimonial communication at the September 25 meeting, although they are a factor to consider in examining the totality of the circumstances.

Curtin drove herself to the interview, which was conducted in a conference room at a hotel.  The room was furnished as a typical conference room, and the door was unlocked throughout the interview.  There was no obvious law enforcement presence.  Agent Harlan-Upp was not wearing a uniform, and she made no overt threats or promises to Curtin.  On the whole, the Court finds that the location and atmosphere of the interview were not coercive.

It is undisputed that Agent Harlan-Upp was deceptive in representing herself as vocational rehabilitation specialist Sandra Black and repeatedly assuring Curtin that the purpose of the interview was to assess Curtin's abilities and suitability for working in a light-duty job.  However, "questioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne."  *Jenner*, 982 F.2d at 334.

12

> The mere fact that an officer may have elicited a confession through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, does not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.

*United States v. Boslau*, 632 F.3d 422, 428-29 (8th Cir. 2011) (quoting *United States v. Brave Heart*, 397 F.3d 1035, 1041 (8th Cir. 2005)) (internal quotation marks omitted). In *United States v. Brave Heart*, for example, the court determined that a false promise made by a police officer that he did not intend to arrest the defendant did not render the subsequent confession involuntary *per se*. 397 F.3d at 1041. The misrepresentation was merely one factor to be considered in the totality of the circumstances to determine if the interrogation caused the defendant's will to be overborne. *Id.* (citing *Jenner*, 982 F.2d at 33).

Agent Harlan-Upp's assurance to Curtin that the purpose of the meeting was to determine her abilities and suitability for a light-duty job was somewhat accurate, in that the agent did want to obtain information about Curtin's abilities and suitability for employment. But the agent did not intend to use the information to assist Curtin in finding a job, as she implied. Instead, Agent Harlan-Upp was gathering the information as part of a criminal investigation. If Agent Harlan-Upp had assured Curtin that her answers would *not* be used in a criminal prosecution, that would be the kind of affirmative misrepresentation suggestive of coercion. The Court finds here that Agent Harlan-Upp's misleading statements and deception did not necessarily render Curtin's statement involuntary, but are factors to consider in assessing the totality of the

13

circumstances.

An ASL interpreter was provided and interpreted the entire interview. The interpreter was a neutral third-party and was not aware of the true reason for the interview. Curtin suggests she should have been involved in choosing the interpreter (Def.'s Mem. at 9), but there is no evidence that the interpreter was unqualified, impartial, or ineffective. There is no evidence that Curtin asked beforehand to bring her own interpreter or asked during the interview for a different interpreter. Curtin expressed no misgivings about or problems with the interpreter at any time.

Curtin freely helped herself to water during the interview and accepted a phone call. Curtin's overall demeanor was friendly and polite, and she shared family photographs with Agent Harlan-Upp during a break in the interview. Though she became distraught when discussing the termination of her benefits and the extent of her disability, this was a natural reaction to the subject matter of the conversation and did not indicate that her will was overborne. Curtin's maturity, education, physical condition, and mental condition did not appear impaired at any time during the interview. At the beginning and end of the interview, Curtin asked that the form be interpreted for her rather than reading it herself, but this did not indicate a learning disability or other mental impairment, simply a preference. The Court finds that Curtin's personal characteristics did not adversely affect her capacity to resist pressure or make her susceptible to having her will overborne.

Although Curtin never asked outright for an attorney or a union representative, she told Agent Harlan-Upp at the beginning of the meeting that she had decided to hire an

attorney to help her with workers' compensation issues.  Curtin did not unequivocally ask

for an attorney, however, and Agent Harlan-Upp was not required to terminate the

interview or clarify whether Curtin was in fact represented by counsel.  "[I]f a suspect

makes a reference to an attorney that is ambiguous or equivocal in that a reasonable

officer in light of the circumstances would have understood only that the suspect *might* be

invoking the right to counsel," questioning may continue.  *Davis v. United States*, 512

U.S. 452, 459 (1994) (citations omitted) (emphasis in original).  "Rather, the suspect

must unambiguously request counsel."  *Id.*

The interview lasted about two and a half hours, which is not inherently coercive.

*United States v. Makes Room*, 49 F.3d 410, 413, 415 (8th Cir. 1995) (finding the duration

of a two and a half hour interrogation not coercive); *see Jenner*, 982 F.2d at 334 (finding

six or seven hours of questioning "not per se unconstitutionally coercive").

Taking into account the record as a whole and the totality of the circumstances

surrounding the interview, the Court finds that Curtin's will was not overborne as to the

statements she made through sign language.  Although the correspondence and some of

Agent Harlan-Upp's statements were deceptive and misleading, those circumstances did

not so overwhelm Curtin's will and critically impair her capacity for self-determination

that her statements could be considered coerced and thus involuntary under the Fifth

Amendment.

### b.    Statements Recorded on the Current Capability Evaluation Form and Certified by Curtin's Signature

At the end of the interview, when Agent Harlan-Upp first asked Curtin to sign the

certification section of the Current Capability Evaluation form, Curtin refused and said she wanted to review it with someone else first.  By this, Curtin clearly indicated it was her will not to sign the form.  To weaken Curtin's resolve, Agent Harlan-Upp explained that a signature would certify simply that the information on the form was true and correct.  She did not advise Curtin at that time that criminal consequences could result. Agent Harlan-Upp then read the certification section to Curtin—for the first time— including the warning about criminal prosecution, but omitting the warning that Curtin could be penalized by a fine or imprisonment.  Agent Harlan-Upp's failure to read the entire certification section was affirmatively deceitful, and especially so given Curtin's prior acknowledgement that she was not a good reader and her request that Agent Harlan-Upp read the form audibly for the interpreter to interpret to Curtin.  These circumstances put Agent Harlan-Upp on notice to be thorough and precise when audibly reading written documents, and should not have been exploited as a gateway for deception.

Immediately after Agent Harlan-Upp read the certification section, she again summarized the certification section, but omitted altogether any warning of criminal prosecution or penalties and stated that Curtin's signature meant only that the information on the form was true and accurate.  Knowing that Curtin did not want to sign the form, Agent Harlan-Upp thus pressured her into signing it by twice misrepresenting the contents of the certification section, and by failing to include the specific criminal penalties at stake when she read the section out loud for interpretation.

The Court finds that Agent Harlan-Upp's misrepresentations and omissions concerning the content of the certification section and the significance of a signature

compelled Curtin to sign the form against her clear will.  Under the circumstances at hand, the Court concludes that Curtin's signature ratifying the statements recorded on the form and certifying their accuracy was not voluntary.  Therefore, her signature on the form should be suppressed as obtained in violation of the Fifth Amendment, along with the statements on the form insofar as they could otherwise be deemed adopted or ratified by Curtin as a result of her signature.

### 2.    Applicability to Undercover Investigations

The Government contends the Fifth Amendment is not applicable to interactions with undercover law enforcement officers.  But the cases cited by the Government pertain to undercover informants, not undercover officers.  *See United States v. Ladoucer*, No. 07-cr-165 (ADM/JSM), 2007 WL 3375223, at *19 (D. Minn. Aug. 30, 2007), *R. & R. adopted in part*, 2007 WL 3051434 (D. Minn. Oct. 17, 2007); *United States v. Johnson*, 196 F. Supp. 2d 795, 892 (N.D. Iowa 2002), *rev'd*, 338 F.3d 918 (8th Cir. 2003), *rev'd on rehearing*, 352 F.3d 339 (8th Cir. 2003).

The only potentially apposite legal authority cited by the Government is a Seventh Circuit decision, *United States v. Walker*, 760 F.2d 144 (7th Cir. 1985).  There, the court indicated that the Fifth Amendment was not implicated because an IRS agent "acted in [an] undercover, not official, capacity."  *Id.* at 146.  The court then explained that the Fifth Amendment "is implicated only in the context of custodial interrogation."  *Id.*  In light of other authority indicating that the touchstone of the Fifth Amendment is voluntariness, not custody, *see Beckwith v. United States*, 425 U.S. 341, 347 (1976), the Court respectfully declines to adopt the Government's proffered standard.

### 3.      False Statements

The Government next asserts that the Fifth Amendment does not protect false statements, but the cases cited by the Government are factually and legally inapposite. The issue in *United States v. Allmon* was whether an individual held in contempt for refusing to testify at trial pursuant to a plea agreement could rely on the Fifth Amendment privilege against self-incrimination as the basis for his refusal. 594 F.3d 981, 983 (8th Cir. 2010). The court held that the Amendment does not confer a right to refuse to testify simply because the witness intends not to testify truthfully. *Id.* at 987. The issue in *In re J.W.O.* was whether an individual could be held in contempt for failing to comply with a grand jury subpoena, in light of his assertion of the Fifth Amendment privilege against self-incrimination. 940 F.2d 1165, 1166 (8th Cir. 1991). The court held that testimonial aspects of a self-incriminating act fall within the scope of the Fifth Amendment, and that the privilege was adequately protected by the scope of immunity afforded by 18 U.S.C. § 6002, which grants limited immunity to a witness ordered to testify before a grand jury. *J.W.O.*, 940 F.2d at 1167-68.

Relatedly, the Government asserts that the Fifth Amendment does not bar the use of false statements during a prosecution for the falsity of those statements, citing *United States v. Hendricks*, No. 3:14-cr-00259-JO, 2015 WL 224747, at *2 (D. Or. Jan. 15, 2015). But Curtin is not being prosecuted for the statements she made during the September 25 interview. Rather, she is charged with making false statements on numerous EN-1032 forms she submitted in support of her continued entitlement to FECA benefits, and in particular, the form she submitted on May 22, 2014. (Indictment ¶¶ 1.b,

1.c, 4-6.)

### B.   *Grunewald*

Curtin next argues, citing *United States v. Grunewald*, 987 F.2d 531 (8th Cir. 1993), that even if her statements during the September 25 interview were voluntary, they should be suppressed because they were obtained during a criminal investigation conducted under the guise of a civil investigation.  The issue in *Grunewald* was whether evidence obtained during a civil IRS investigation and audit of the defendant's income tax returns should have been suppressed at the defendant's criminal trial.  *Id.* at 533-34. The *Grunewald* court began by observing, "It is clear that the IRS may not develop a criminal investigation under the auspices of a civil audit."  *Id.* at 534.  "Significantly different rights, responsibilities, and expectations apply to civil audits and criminal tax investigations.  It would be a flagrant disregard of individuals' rights to deliberately deceive, or even lull, taxpayers into incriminating themselves during an audit when activities of an obviously criminal nature are under investigation."  *Id.*  Once an IRS agent develops "firm indications of fraud," the agent must turn over the case to the criminal investigation unit of the IRS.  *Id.*  But the court went on to hold that when the subject of an IRS criminal investigation has not been informed of the nature of the investigation, evidence obtained during the course of that investigation may be suppressed *only* when the defendant shows that: "1) the IRS had firm indications of fraud by the defendant, 2) there is clear and convincing evidence that the IRS affirmatively and intentionally misled the defendant, and 3) the IRS's conduct resulted in prejudice to defendant's constitutional rights."  *Id.*

The Government notes several distinctions between *Grunewald* and the present case.  First, *Grunewald* addressed evidence obtained during an IRS civil audit and used during a criminal proceeding.  The Eighth Circuit Court of Appeals has not extended *Grunewald* to other agencies with civil and criminal investigative divisions, although at least one court in this district has done so.  *United States v. Rosenblum*, No. 07-cr-294 (JRT/FLN), 2008 WL 582356, at *6 (D. Minn. Mar. 3, 2008) (applying *Grunewald* to an undercover criminal investigation conducted by the Metropolitan Council Environmental Services Agency).

Second, the evidence subject to suppression in the present case was not obtained during the administrative civil investigation, as was the case in *Grunewald*, but by the criminal division of the USPS after the case was referred for criminal investigation.  Once USPS Health and Resource Management Specialist Nancy Schmitz developed "firm indications of fraud," she forwarded the case to Agent Wayerski for criminal investigation, consistent with the court's admonition in *Grunewald*, and Curtin's statements were obtained as a part of the subsequent criminal investigation.  There is precedent in this district, however, for the application of *Grunewald* to an undercover criminal investigation.  *United States v. Pour*, No. 09-cr-101 (JNE/JSM), 2009 WL 2407697, at *1-2, *6 (D. Minn. July 30, 2009) (applying *Grunewald* test to evidence obtained in an undercover criminal investigation by the IRS); *Rosenblum*, 2008 WL 582356, at *6.

Third, the Government observes that *Grunewald* has been applied most frequently in the Fourth Amendment context, but that is not reason alone to refuse to extend

*Grunewald* to the Fifth Amendment context.  Several courts have recognized that the

*Grunewald* factors or similar considerations apply to statements acquired in violation of

the Fifth Amendment.  *See United States v. Wadena*, 152 F.3d 831, 851 (8th Cir. 1998);

*United States v. Baisden*, No. 4:10CR3026, 2010 WL 5606727, at *5 (D. Neb. Dec. 17,

2010), *R. & R. adopted*, 2011 WL 175925 (D. Neb. Jan. 19, 2011); *United States v.*

*Gangar*, No. 3:07CR00010, 2007 WL 3552336, at *1 (W.D. Va. Nov. 15, 2007).

But although the distinctions identified by the Government may be distinctions

without a difference, the Court concludes for the reasons discussed below that even if it

applies *Grunewald* here, Curtin's statements should not be suppressed.

With respect to the first element, it is undisputed that the USPS had firm

indications of fraud.  In fact, once USPS Health and Resource Management Specialist

Nancy Schmitz saw such signs, she forwarded the case to Agent Wayerski for criminal

investigation.  And as to the second element, the Court finds clear and convincing

evidence that the USPS and Agent Harlan-Upp affirmatively and intentionally misled

Curtin about the nature of the interview.  The USPS did not merely fail "to inform

[Curtin] that information developed in [its investigation] may result in a further criminal

investigation."  *See Grunewald*, 987 F.2d at 534.  Rather, the USPS and Agent Harlan-

Upp affirmatively and intentionally misled her into believing that the interview was civil

in nature and that the purpose was to determine her abilities and suitability for

employment, in both the August and September letters and during the September 25

interview.

Resolution of this issue therefore depends on the third element: whether the

USPS's conduct prejudiced Curtin's constitutional rights.  Curtin argues in her post-

hearing memorandum that

> If [she] had known that she was the target of a federal criminal
> investigation, she surely would have, at a minimum, invited her union
> representative to attend the interview.  And she likely would have met with
> a lawyer ahead of time to determine whether to attend the interview.
> Obviously, a lawyer would have advised of her Fifth Amendment right
> against self-incrimination.

(Def.'s Mem. at 5-6.)  It is easy to speculate, in hindsight, what Curtin might have done

or what Curtin's attorney or union representative might have advised.  But there is no

basis to conclude that if the true nature of the investigation had been disclosed, Curtin

would not have spoken with Agent Harlan-Upp, or would have brought her attorney or

union representative to the meeting.  *See Rosenblum*, 2008 WL 582356, at *6 (finding the

third *Grunewald* factor was not met because the defendant did not show "how his due

process rights were prejudiced, that is, how those rights would have been exercised or

otherwise protected had the government not concealed the fact of its criminal

investigation"); *cf. Pour*, 2009 WL 2407697, at *7 (finding the third factor was not met

due to the defendant's lack of testimony or argument that he would not have spoken with

agents if he had known beforehand that he was the target of the investigation).

Moreover, although the third *Grunewald* factor is phrased somewhat ambiguously

in requiring "prejudice to defendant's constitutional rights," a constitutional violation—

not some unquantified degree of prejudice—is required to meet the factor.  *See United*

*States v. Rutherford*, 555 F.3d 190, 197-98 (6th Cir. 2009) (citing *Grunewald*, *inter alia*,

and recognizing that the circuit courts of appeals have been "reluctant to impose the

22

exclusionary rule when the Constitution has not been violated") (citations omitted); *Baisden*, 2010 WL 5606727, at *7-8 (finding that the defendant did not show prejudice to his constitutional rights because the agent's conduct did not rise to a Fourth or Fifth Amendment violation); *see also United States v. Tweel*, 550 F.2d 297, 299-300 (5th Cir. 1977) (suppressing evidence obtained during a ruse civil investigation upon finding a Fourth Amendment violation).

As *Rutherford* explained, "courts may have been too generous in defining the sort of conduct that rises to the level of a due process violation." 555 F.3d at 198. "Even when the police are conducting a custodial interrogation, . . . mere deception will not violate a person's due process rights." *Id.* The conduct must also have a "coercive effect," actually overwhelming the will of the subject. *Id.* To hold otherwise and "increase the standard for voluntariness in a noncustodial context" would "embrace openly a double standard for the incriminating statements of white-collar criminals, making it much more likely their statements will be considered involuntary and thus excluded from criminal proceedings." *Id.*

*Rutherford*'s rationale is consistent with *Grunewald*'s framework, which considers separately affirmative and intentional deception (element two) and prejudice to constitutional rights (element three). That is, a defendant does not establish prejudice to his constitutional rights simply by showing affirmative and intentional deception. Something more is required. Otherwise, the second element would render the third element superfluous.

The rationale of *Grunewald* itself is consistent with the requirement of a

23

constitutional violation in order to meet the third factor.  "Significantly different rights, responsibilities, and expectations apply to civil audits and criminal tax investigations.  It would be a flagrant disregard of individuals' rights to deliberately deceive, or even lull, taxpayers into incriminating themselves during an audit when activities of an obviously criminal nature are under investigation."  *Grunewald*, 987 F.2d at 534.  An individual subject to a criminal investigation is entitled to no less than a full slate of constitutional rights.  The *Grunewald* court was concerned with ensuring that the *same* slate of rights is extended to individuals subject to a civil investigation that is being conducted as a part of, or related to, a criminal investigation, regardless of whether the individuals are aware of the criminal investigation or operating under a misapprehension about the nature of the inquiry.

The Court determined *supra* that Curtin's statements provided via sign language during the interview (as distinguished from her signature and certification of the responses recorded on the questionnaire) were voluntary and were not obtained in violation of the Fifth Amendment.  Similarly, the Court concludes, under *Grunewald*, that the USPS's conduct leading to those statements did not prejudice Curtin's Fifth Amendment rights.

Accordingly, based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Terry A. Curtin's Motion to Suppress Statements [Doc. No. 27] be **GRANTED** as to Curtin's signature and the statements recorded on the Current Capability Evaluation Form (Gov't Ex. 4), insofar as those statements could

otherwise be deemed adopted or ratified by Curtin as a result of her signature; and

**DENIED** as to Curtin's other statements.


Dated: October 29, 2015

s/ *Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.